IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JAMES WATSON, | : | |
| Petitioner, | : | 1:16-cv-0874 |
| | : | |
| v. | : | |
| | : | Hon. John E. Jones III |
| MICHAEL E. CLARK, *et al.*, | : | |
| Respondents. | : | |

## MEMORANDUM

### March 8, 2019

Petitioner James Watson ("Petitioner" or "Watson"), a state inmate files the instant petition (Doc. 1) for writ of habeas corpus pursuant to 28 U.S.C. § 2254, seeking relief from the Judgment of Sentence entered in the Court of Common Pleas of Bradford County, Pennsylvania, on November 22, 2002, following convictions for first-degree murder, conspiracy to commit homicide, kidnapping, conspiracy to commit kidnapping, and other related offenses. (Doc. 1).

For the reasons set forth below, the petition for writ of habeas corpus, which is governed by the Antiterrorism and Effective Death Penalty Act of 1996, Pub.L.No. 104-132, 110 Stat. 1214, April 24, 1996 ("AEDPA"), will be denied.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

In a January 15, 2016 decision adjudicating Watson's appeal from the December 31, 2014 order of the Post Conviction Relief Act ("PCRA") court, the

Superior Court of Pennsylvania set forth the following relevant facts and

procedural history:

> Generally, the evidence at trial, consisting of eyewitness testimony, established that in the afternoon of April 17, 2001, an argument developed between Jason Ryans [("Victim")] and the Watson brothers [(Kenny Watson and [James Watson])] at Kenny Watson's home in Wilkes-Barre, Pennsylvania. The Watsons believed that [Victim] had stolen a handgun and a safe containing marijuana and money. During the argument, Kenny Watson punched [Victim]. In an ensuing struggle, [James Watson] grabbed a knife and inflicted multiple wounds to [Victim's] hands and arms. [Victim] was also punched and kicked repeatedly by the Watsons. The Watsons then bound the wrists of [Victim], either for the purpose of stopping his bleeding or to prevent his escape, or both. [Victim] was then placed in a vehicle and transported to a rural area near the Village of Camptown in Bradford County. There, [Victim] was taken from the vehicle and shot twice in the back of the head by [James Watson]. [Victim] apparently died immediately.

> The evidence against [James Watson] and Kenny Watson diverged with respect to their criminal culpability following the altercation in Wilkes-Barre. After [Victim] was bound, the Watsons then informed others at the house that they would be taking [Victim] to a hospital, but would seek a rural hospital. The evidence revealed that [James Watson] was in fact simply looking for a secluded place to murder [Victim], but the evidence also suggested that Kenny Watson, among others, was duped into accompanying [James Watson] to Bradford County. The jury at least had a reasonable doubt as to Kenny Watson's complicity in any plan to kill [Victim], for it acquitted him of all charges of homicide and conspiracy to commit homicide. Kenny Watson's counsel admitted to the jury that his client was guilty of assault, but denied his involvement in any action or plan intended to kill [Victim].

Procedurally, the jury reached a verdict on September 12, 2002, convicting [James Watson] of first-degree murder, conspiracy to commit homicide, kidnapping, conspiracy to commit kidnapping, and other related offenses. The court sentenced [James Watson] on that day to life imprisonment for his murder conviction, but deferred sentencing on the remaining convictions. On November 22, 2002, the court imposed an aggregate sentence of forty-six (46) to ninety-two (92) years' imprisonment for [James Watson's] remaining convictions, consecutive to [his] life sentence.

This Court affirmed the judgment of sentence on August 20, 2004, and our Supreme Court subsequently denied allowance of appeal on April 18, 2005. *See Commonwealth v. Watson*, 860 A.2d 1136 (Pa. Super. 2004), appeal denied, 582 Pa. 717, 872 A.2d 1199 (2005). [The sole issue raised on appeal was "Did the trial court abuse its discretion by denying [James Watson's] motion for a mistrial when the co-defendant's attorney violated Pennsylvania Rule of Evidence 410 and made reference in his opening statement regarding plea discussions and [] [James Watson's] willingness to accept a deal? (Doc. 10-4, p. 4)] On May 18, 2005, [James Watson] timely filed a *pro se* PCRA petition. The court appointed counsel, who filed an amended PCRA petition on April 9, 2008. The court held hearings on the petitions on April 7, 2008, April 9, 2008, and January 6, 2010. The court denied PCRA relief on January 4, 2011. [The court determined it had improperly imposed separate sentences for each of [James Watson's] conspiracy convictions; consequently, the court granted PCRA relief in that respect]. On January 26, 2011, [he] filed a notice of appeal.

*Commonwealth v. Watson*, No. 202 MDA 2011, unpublished memorandum at 1-2 (Pa. Super filed June 1, 2012)(some internal citations omitted); (Doc. 10-19, pp. 1-3).

[[Watson] raise[d] six issues for [] review:

[1.] Did the District Attorney's trial summation, as it pertained to the fact that [James Watson], co-defendant Kenny Watson and an

unindicted alleged co-conspirator and accomplice – Michael Robinson, did not testify at trial, constitute prosecutorial misconduct warranting a new trial? (Ineffective assistance of trial counsel)[.]

[2.] Did [James Watson's] trial attorney have a conflict of interest which prejudiced [James Watson] when he represented [James Watson] while and after he also represented Rodney Watson thus causing the need for a new trial? (Ineffective assistance of counsel)[.]

[3.] Did the recantation testimony of Myrna Taitt's trial testimony, and a pretrial statement she gave the Pennsylvania State Police to the effect that [James Watson] confessed to having committed the homicide at issue, warrant a new trial?(Newly found evidence)[.]

[4.] Did Rodney Watson's post-homicide behavior and statement establish that he was more than a witness to the [Victim's] murder, that he was actively criminally involved, so much so that [James Watson] is entitled to a new trial? (Newly found evidence) (A) Rodney Watson's statement that he didn't see [James Watson] commit the homicide; (B) Rodney Watson's theft of a safe which precipitated the homicide [footnote omitted]; (C) Rodney Watson said he wasn't going to spend his life in jail for the homicide at issue[.]

[5.] Did trial counsel render ineffective assistance to [James Watson], given that Janelle Prato, pretrial, told the defense attorney's investigator that Jennifer Barr (who at trial testified that she was an eyewitness to the homicide and [James Watson] told her he killed [Victim]) told her [James Watson] didn't kill [Victim]? (Ineffective assistance of trial counsel)[.]

6. Was [James Watson's] right to appeal violated – (Ineffective assistance of counsel)[?]

(Doc. 10-19, pp. 3-5).]

On appeal this Court affirmed in part and remanded the case for the PCRA to make additional findings with regard to two of [James Watson's] issues. *See Id*. Following remand, the PCRA court again

denied relief on January 2, 2015. [James Watson] filed a timely notice of appeal on January 30, 2015.

(Doc. 10-24, pp. 1-3). Watson raised two issues:

[1] Did the PCRA court commit error regarding the Prato-Barr conversation when, making a credibility determination that Prato's testimony did not necessitate PCRA relief for [Watson], the court found that [Watson] first failed to establish that his trial attorney knew or should have known of the Prato-Barr conversation and had Prato testify at trial, and second, that [Watson] failed to establish prejudice because the absence of Prato testimony at trial [?]" On January 15, 2016, the Superior Court affirmed the PCRA court's order. (*Id.* at 10).

[2] Did the court commit error regarding the preservation of [Watson's] appellate rights in first not finding that [Watson's] appellate rights were not preserved not employing a "per se" prejudice statement in this case, and second no reaching real credibility determinations.

(*Id.* at 3, 4). The Superior Court affirmed the PCRA court order denying relief.

(*Id.* at 10). Thereafter, Watson timely filed the instant petition pursuant to 28 U.S.C. § 2254.

## II.   28 U.S.C. § 2254 STANDARDS OF REVEW

A habeas corpus petition pursuant to 28 U.S.C. § 2254 is the proper mechanism for a prisoner in custody pursuant to the judgment of a state court to challenge the "fact or duration" of his confinement. *Preiser v. Rodriguez*, 411 U.S. 475, 498-99 (1973). 28 U.S.C. § 2254, provides, in pertinent part:

(a) The Supreme Court, a Justice thereof, a circuit judge, or a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on

the ground that he is in custody in violation of the Constitution or laws or treaties of the United States.

(b)(1) an application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that –

    (A) the applicant has exhausted the remedies available in the courts of the State;

        ...

(d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—

    (1) resulted in a decision that was contrary to or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

    (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254.

Section 2254 clearly sets limits on the power of a federal court to grant an application for a writ of habeas corpus on behalf of a state prisoner. *Cullen v. Pinholster*, 536 U.S. 170, 181 (2011); *Glenn v. Wynder*, 743 F.3d 402, 406 (3d Cir. 2014). A federal court may consider such a petition only "on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). By limiting habeas relief to state conduct which violates "the

Constitution or laws or treaties of the United States," § 2254 places a high threshold on the courts.

A federal habeas court may not consider a petitioner's claims of state law violations; review is limited to issues of federal law. *See Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) ("[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions."); *Pulley v. Harris*, 465 U.S. 37, 41 (1984) ("A federal court may not issue the writ on the basis of a perceived error of state law."); *Engle v. Isaac*, 456 U.S. 107, 120 n.19 (1982) ("If a state prisoner alleges no deprivation of a federal right, § 2254 is simply inapplicable.").

## III.    DISCUSSION

### A.    Watson's Grounds for Relief

Watson contends that he is entitled to habeas relief on the following grounds:

I.    In failing to notify the Guyana Consulate of his arrest and detention, law enforcement authorities denied Watson, a "Guyanize [sic] citizen," his right to prompt legal advice under "Article 36 of the Vienna Convention on Consular Relations." (Doc. 1-1, p. 11).

II.    Trial counsel's prior representation of Rodney Watson constituted a conflict of interest; trial counsel's failure to notify him of the conflict of interest violated his Sixth Amendment right to effective assistance of counsel. (*Id.* at 16).

III.    The trial court's rulings during the testimony of Commonwealth witness Rodney Watson "allowed prejudicial evidence to be presented to the jury without holding a hearing to colloquy of both trial counsel and Petitioner as related to the issue of conflict of interest…" (*Id.* at 33).

IV.    Trial counsel was ineffective in failing to properly prepare and present evidence at trial.  (*Id.* at 39).

V.    Trial counsel was ineffective in failing to object to prejudicial evidence and statements.  (*Id.* at 69).

(Doc. 1-1).  Although Watson clearly raises claims that, in theory, are appropriately considered in the context of a federal petition, for the reasons set forth below, we are precluded from reviewing a number of them on the merits because they have been procedurally defaulted in the state courts.

## B.    Grounds I, III, IV and V – Procedural Default Analysis

Watson concedes that the claims raised in Ground I (Doc. 1-1, pp. 16-21; Doc. 13, pp. 2-4), Ground III (Doc. 1-1, pp. 33-38), and portions of Grounds IV (*id.* at 40, 41) and V (*id.* at 80, 81) are procedurally defaulted.  Habeas relief cannot be granted unless all available state remedies have been exhausted, or there is an absence of available state corrective process, or circumstances exist that render such process ineffective to protect the rights of the applicant.  *See* 28 U.S.C. § 2254(b)(1).  Section 2254 dictates that relief  "shall not be granted unless it appears that . . . the applicant has exhausted the remedies available in the courts of the State," meaning a state prisoner must "fairly present" his claims in "one

8

complete round of the state's established appellate review process," before

bringing them in federal court. 28 U.S.C. § 2254(b)(1)(A); *see also O'Sullivan v.*

*Boerckel*, 526 U.S. 838, 845 (1999) (stating "[b]ecause the exhaustion doctrine is

designed to give the state courts a full and fair opportunity to resolve federal

constitutional claims before those claims are presented to the federal courts, . . .

state prisoners must give the state courts one full opportunity to resolve any

constitutional issues by invoking one complete round of the State's established

review process."); *see also Duncan v. Henry*, 513 U.S. 364, 365 (1995); *Picard v.*

*Connor*, 404 U.S. 270, 275 (1971); *Lambert v. Blackwell*, 134 F.3d 506, 513 (3d

Cir. 1997). The exhaustion requirement is grounded on principles of comity in

order to ensure that state courts have the initial opportunity to review federal

constitutional challenges to state convictions. See *Werts v. Vaughn*, 228 F.3d 178,

192 (3d Cir. 2000).

A petitioner has exhausted a federal claim only if he or she presented the

"substantial equivalent" of the claim to the state court. *Picard*, 404 U.S. at 278.

To satisfy this requirement, a petitioner must "fairly present" his federal claim's

"factual and legal substance to the state courts in a manner that puts them on notice

that a federal claim is being asserted." *Robinson v. Beard*, 762 F.3d 316, 328 (3d

Cir. 2014); *see Baldwin v. Reese*, 541 U.S. 27, 29 (2004); *see McCandless v. Vaughn*, 172 F.3d 255, 261 (3d Cir. 1999).

"When a claim is not exhausted because it has not been 'fairly presented' to the state courts, but state procedural rules bar the applicant from seeking further relief in state courts, [as is the case here,] the exhaustion requirement is satisfied because there is 'an absence of available State corrective process.' 28 U.S.C. § 2254(b). In such cases, however, applicants are considered to have procedurally defaulted their claims and federal courts may not consider the merits of such claims unless the applicant establishes 'cause and prejudice' or a 'fundamental miscarriage of justice' to excuse his or her default. *See Coleman v. Thompson*, 501 U.S. 722, 750, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991)." *McCandless*, 172 F.3d at 260.

To demonstrate "cause" for a procedural default, a petitioner must point to some objective external factor which impeded his efforts to comply with the state's procedural rule. *See Murray v. Carrier*, 477 U.S. 478, 488 (1986). "Prejudice" will be satisfied only if he can demonstrate that the outcome of the state proceeding was "unreliable or fundamentally unfair" as a result of a violation of federal law. *See Lockhart v. Fretwell*, 506 U.S. 364, 366 (1993).

In attempting to demonstrate "cause for the default and prejudice attributable thereto," or "that the failure to consider the federal claim will result in a fundamental miscarriage of justice," *Harris v. Reed*, 489 U.S. 255, 262 (1989); s*ee also*, *Werts*, 228 F.3d at 192-93 (A petitioner can overcome procedural default, and thereby empower the habeas court to entertain the merits of the habeas claim, with a showing of "cause and prejudice" or by demonstrating a fundamental "miscarriage of justice."); *see also Schlup v. Delo*, 513 U.S. 298, 321 (1995) (The miscarriage of justice exception is "explicitly tied...to the petitioner's innocence."), he relies wholly on the exception set forth *Martinez v. Ryan*, 566 U.S. 1 (2010).

The *Martinez v. Ryan*, 566 U.S. 1 (2010) case recognized a "narrow exception" to the general rule that attorney errors in collateral proceedings do not establish cause to excuse a procedural default. Specifically, *Martinez* holds that "[i]nadequate assistance of counsel at initial-review collateral proceedings may establish cause for a prisoner's procedural default of a claim of ineffective assistance at trial." 566 U.S. at 9, 132 S.Ct. 1309. To successfully invoke the *Martinez* exception, a petitioner must satisfy two factors: that the underlying, otherwise defaulted, claim of ineffective assistance of trial counsel is "substantial," meaning that it has "some merit," *id.* at 14, 132 S.Ct. 1309; and that petitioner had "no counsel " or "ineffective" counsel during the initial phase of the state collateral

review proceeding. *Id.* at 17, 132 S.Ct. 1309; *see also Glenn v. Wynder*, 743 F.3d 402, 410 (3d Cir. 2014). Both prongs of *Martinez* implicate the controlling standard for ineffectiveness claims first stated in *Strickland v. Washington*: (1) that counsel's performance was deficient; and (2) the deficient performance prejudiced the defense. 466 U.S.668, 687 (1984).

1.   <u>Ground I</u>

In his first ground in the petition, Watson states the failure of law enforcement officials to give notice of his arrest to his foreign consulate in Guyana violated his constitutional rights. He argues that "[b]y denying [him] this right to speak to the consular's [sic] office or notified [sic] the consular office…[law enforcement authorities] denied [him] meaningful legal advise [sic] at a critical point in the criminal process, inabeling [sic] [them] allegedly [to] obtain incriminating statements…." (Doc. 1-1, p. 16).

Initially, *Martinez* is limited to defaulted claims of ineffective assistance of trial counsel; it has no applicability to Watson's claim that law enforcement officials violated his rights under the treaty. *See Davila v. Davis*, ⎯⎯ U.S. ⎯⎯, 137 S.Ct. 2058, 2065 (2017) (declining to extend *Martinez* to defaulted claims of ineffective assistance of appellate counsel); *Murray v. Diguglielmo*, No. 09-4960, 2016 WL 3476255, at *4 (E.D. Pa. June 27, 2016) ("These claims do not involve

ineffective assistance of [trial] counsel. *Martinez* does not apply."). Federal review of this claim is barred.

To the extent that he argues that the default is excused based on PCRA counsel's ineffectiveness in refusing to raise trial counsel's ineffectiveness, because the underlying, otherwise defaulted, claim of trial counsel's ineffective assistance lacks merit, the *Martinez* exception is unavailable. He contends that, even though he informed PCRA counsel of trial counsel's failure to raise the issue of law enforcement's omission regarding his rights under Article 36 of the treaty, PCRA counsel declined to include the claim in his PCRA petition. (Doc. 1-1, p. 20). "Article 36 of the Vienna Convention on Consular Relations (Vienna Convention or Convention), Apr. 24, 1963, [1970] 21 U.S.T. 77, 100–101, T.I.A.S. No. 6820, addresses communication between an individual and his consular officers when the individual is detained by authorities in a foreign country." *Sanchez-Llamas v. Oregon*, 548 U.S. 331, 337 (2006). "The violation of the right to consular notification…is at best remotely connected to the gathering of evidence. Article 36 has nothing whatsoever to do with searches or interrogations. Indeed, Article 36 does not guarantee defendants any assistance at all. The provision secures only a right of foreign nationals to have their consulate informed of their arrest or detention—not to have their consulate intervene, or to have law

enforcement authorities cease their investigation pending any such notice or intervention. In most circumstances, there is likely to be little connection between an Article 36 violation and evidence or statements obtained by police." *Id.* at 349. The *Sanchez-Llamas* Court further noted that "[a] foreign national detained on suspicion of crime, like anyone else in our country, enjoys under our system the protections of the Due Process Clause. Among other things, he is entitled to an attorney, and is protected against compelled self-incrimination. *See Wong Wing v. United States*, 163 U.S. 228, 238 [](1896) ('[A]ll persons within the territory of the United States are entitled to the protection guaranteed by' the Fifth and Sixth Amendments). Article 36 adds little to these 'legal options,' and we think it unnecessary to apply the exclusionary rule where other constitutional and statutory protections—many of them already enforced by the exclusionary rule—safeguard the same interests Sanchez–Llamas claims are advanced by Article 36." *Id.* at 350.

It is clear that Watson's underlying, otherwise defaulted claim, that trial counsel was ineffective in failing to seek suppression of incriminating statements obtained in violation of his rights under Article 36 of the treaty, lacks merit. Consequently, his procedural default cannot be excused based on *Martinez*. Federal review is therefore precluded.

## 2.    Ground III

In his third ground, Watson argues that he is entitled to relief based on the trial court's "actions and decisions" in allowing the prejudicial testimony of Commonwealth witness Rodney Wilson without conducting a colloquy to determine whether trial counsel's prior representation of the witness constituted a conflict of interest.  (Doc. 1-1, pp. 33- 38).  He concedes that the claim is procedurally defaulted and again turns to *Martinez,* arguing that that the default should be excused because it is attributable to collateral counsel's failure to properly develop and present the claim. (*Id.* at 34).  However, as noted *supra*, because *Martinez* applies only to defaulted claims of ineffective assistance of trial counsel, not trial court error, the exception is not available.  *See Davila*, 137 S.Ct. at 2065. The procedural default cannot be excused on that basis.

## 3.    Ground IV

In Ground IV, Watson contends that trial counsel was ineffective in failing to properly prepare and present evidence through various witnesses.  Of those witnesses, review of the state court record reveals that the claims concerning counsel's failure to call Gary Watson and Sharla Timmons as alibi witnesses are procedurally defaulted because they were not included in the appeal of the PCRA court's decision to the Superior Court.  (Doc. 10, p. 11; Doc. 10-17, p. 7; Doc. 10-

19, pp. 3-5; Doc. 10-24, pp. 3, 4). Further, the claims concerning the testimony of Myrna Taitt, Richard Fischbein, Lisa Sullivan and Kenneth Michaels, and McKenzie Keller's testimony about a conversation she had with Rodney Watson, are procedurally defaulted because they were presented in the PCRA proceedings as after-discovered evidence claims, not ineffective assistance of trial counsel claims.

Watson fails to address the procedural default in his petition, brief in support of the petition, or in his reply memorandum, and he does not rely on *Martinez*. Even had he relied on *Martinez*, he would not prevail. PCRA counsel included the argument concerning the alibi testimony of Gary Watson and Sharla Timmons in the initial PCRA proceedings but abandoned the argument during the PCRA appeal proceedings. (Doc. 10-10, pp. 11, 12; Doc. 10-17, p. 7). Therefore, the ineffectiveness, if any would have occurred during the appeal process, not the initial collateral proceeding. The *Martinez* exception only applies to the effectiveness of counsel in an initial collateral proceeding, not an appeal. *See Davila,* 137 S.Ct. at 2065. The testimony of Myrna Taitt, Richard Fischbein, Lisa Sullivan, and Kenneth Michaels, as well as McKenzie Keller's testimony concerning a conversation she had with Rodney Watson, was wholly characterized and offered at the PCRA hearing as after-discovered evidence for the sole purpose

of obtaining a new trial. Because after-discovered evidence, by definition, is evidence that could not have been obtained prior to the conclusion of the trial by the exercise of reasonable diligence, it cannot possibly form the basis of a meritorious ineffective assistance of trial counsel claim. (Doc. 10-19, p. 15). Since the *Martinez* exception applies only to defaulted claims of ineffective assistance of trial counsel, no relief from the procedural default is warranted.

    4.   <u>Ground V</u>

In his fifth ground, Watson contends, *inter alia*, that trial counsel was ineffective in failing to object to the prosecutor's references to "a black man" and his characterization of Watson as "the General." (Doc. 1-1, pp. 70, 71). Watson again invokes the *Martinez* exception to excuse the default. (Doc. 1-1, pp. 80-82). However, because the underlying, otherwise defaulted, claim of ineffective assistance of trial counsel lacks merit, he cannot meet the requirements of the *Martinez* exception.

In his opening statement, the prosecutor informed the jury that "James Watson is a take-charge kind of individual. His nickname or street nickname is the General. He's the guy who wants to come in and run everything." (Doc. 10-1, pp. 31, 33). He refers to Watson as "the General" at a few other points in his opening. (Doc. 10-1, pp. 33, 34). The prosecutor also elicited from Watson's mother,

Myrna Taitt, that she calls him General. (Doc. 10-1, p. 196). In fact, in her statement to the police she reports "My son, James, I call him General." (*Id.* at 196, 207, 208, 212, 213). The prosecutor also referenced "the General" in his closing argument when quoting Watson's mother's statement to the police, recounting the testimony of witnesses, and on several other occasions. (Doc. 10-2, pp. 73, 78, 79-84, 86, 89).

With regard to references to a black man, during his opening statement, the prosecutor stated as follows: "The evidence will show that these defendants assumed a number of things. They assumed that the woods in Bradford County would be a good place to kill somebody and dump a body. They assumed there wouldn't be a very serious investigation in a virtually all-white county like this when a black man is found dead. They assumed the police would be very aggressive. They assumed a lot of things. All of those things are wrong." (Doc. 10-1, pp. 29, 30). And, in response to statements made by defense counsel during their closing arguments, that the jury was racist, the prosecutor stated "I hope you're not racist, because this man is black. This man who was killed was black. If you can't be fair in a case involving black people, I sure don't want you on this jury." (Doc. 10-2, p. 70).

"[The Supreme] Court has recognized that prosecutorial misconduct may so infec[t] the trial with unfairness as to make the resulting conviction a denial of due process.... To constitute a due process violation, the prosecutorial misconduct must be of sufficient significance to result in the denial of the defendant's right to a fair trial." *Woods v. Diguglielmo*, 514 Fed. Appx. 225, 227 (3d Cir. 2013) (quoting *Greer v. Miller*, 483 U.S. 756, 765 (1987) (internal quotation marks and other citations omitted)).  The comments cited by Watson do not meet this high standard and, even if they did, we would not conclude that the alleged misconduct "so infec[ted] the trial with unfairness as to make the resulting conviction a denial of due process." *See Greer*, 483 U.S. at 765.  As such, trial counsel's decision not to object to the remarks cannot be deemed deficient.  Because the underlying, otherwise defaulted claim lacks merit, the procedural default of this aspect of Ground V cannot be excused based on *Martinez*.

### C.  Grounds II, IV and V – Claims Adjudicated on the Merits

The claims found in Ground II, and Grounds IV and V, excepting those identified above, all of which raise the ineffective assistance of trial counsel, Demetrius Fannick, Esq. ("Fannick" or "trial counsel"), have been adjudicated on the merits in the state courts. Under the AEDPA, federal courts reviewing a state prisoner's application for a writ of habeas corpus may not grant relief "with respect

19

to any claim that was adjudicated on the merits in State court proceedings" unless the claim (1) "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or (2) "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d).

"[B]ecause the purpose of AEDPA is to ensure that federal habeas relief functions as a guard against extreme malfunctions in the state criminal justice systems, and not as a means of error correction," *Greene v. Fisher*, 565 U.S. 34, 38 (2011) (internal quotations and citations omitted), "[t]his is a difficult to meet and highly deferential standard . . . which demands that state-court decisions be given the benefit of the doubt."  *Cullen*, 563 U.S. at 181(internal quotation marks and citation omitted).  The burden is on Watson to prove entitlement to the writ.  *Id.*

A decision is "contrary to" federal law if "the state court applies a rule that contradicts the governing law set forth in [Supreme Court] cases" or "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [Supreme Court] precedent."  *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000).

"[A] state court decision reflects an 'unreasonable application of such law' only 'where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with [the Supreme] Court's precedents,' a standard the Supreme Court has advised is 'difficult to meet' because it was 'meant to be.' [*Harrison v.*] *Richter*, 562 U.S. 86, [ ] 102, 131 S.Ct. 770. As the Supreme Court has cautioned, an 'unreasonable application of federal law is different from an incorrect application of federal law,' *Richter*, 562 U.S. at 101, 131 S.Ct. 770 (quoting *Williams*, 529 U.S. at 410, 120 S.Ct. 1495), and whether we 'conclude[ ] in [our] independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly' is irrelevant, as AEDPA sets a higher bar. *Williams*, 529 U.S. at 411, 120 S.Ct. 1495." *Mathias v. Superintendent Frackville SCI*, 876 F.3d 462, 476 (3d Cir. 2017). A decision is based on an "unreasonable determination of the facts" if the state court's factual findings are objectively unreasonable in light of the evidence presented to the state court. *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

Finally, Section 2254(e) provides that "[i]n a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue shall be presumed to

be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

The clearly established ineffective assistance of counsel standard as determined by the Supreme Court of the United States is as follows:

Ineffective assistance of counsel claims are "governed by the familiar two-prong test set forth in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)." *Shelton v. Carroll*, 464 F.3d 423, 438 (3d Cir. 2006) (citing *Wiggins v. Smith*, 539 U.S. 510, 521, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003)). For AEDPA purposes, the *Strickland* test qualifies as "clearly established Federal law, as determined by the Supreme Court." *Williams*, 529 U.S. at 391, 120 S.Ct. 1495. Under *Strickland*, a habeas petitioner must demonstrate that: (1) counsel's representation fell below an objective standard of reasonableness; and (2) there is a reasonable probability that, but for counsel's error, the result would have been different. 466 U.S. at 687, 104 S.Ct. 2052. For the deficient performance prong, "[t]he proper measure of attorney performance remains simply reasonableness under prevailing professional norms." *Id.* at 688, 104 S.Ct. 2052. This review is deferential:

A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance....

*Id.* at 689, 104 S.Ct. 2052

Not every "error by counsel, even if professionally unreasonable, ... warrant[s] setting aside the judgment of a criminal proceeding." *Id.* at 691, 104 S.Ct. 2052. "Even if a defendant shows that particular errors of counsel were

unreasonable, ... the defendant must show that they actually had an adverse effect on the defense"; in other words, the habeas petitioner must show that he was prejudiced by counsel's deficient performance. *Id.* at 693, 104 S.Ct. 2052. To establish prejudice, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694, 104 S.Ct. 2052.

In assessing an ineffective assistance of counsel claim, "the ultimate focus of inquiry must be on the fundamental fairness of the proceeding.... In every case the court should be concerned with whether ... the result of the particular proceeding is unreliable because of a breakdown in the adversarial process that our system counts on to produce just results." *Id.* at 696, 104 S.Ct. 2052.

*Rainey v. Varner*, 603 F.3d 189, 197–98 (3d Cir. 2010).

When the state court has decided the claim on the merits, "[t]he question 'is not whether a federal court believes the state court's determination' under the *Strickland* standard 'was incorrect but whether that determination was unreasonable—a substantially higher threshold.' " *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009) (quoting *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007)). "And, because the *Strickland* standard is a general standard, a state court has even more latitude to reasonably determine that a defendant has not satisfied that standard." *Id.*

The standards governing ineffective assistance of counsel claims were twice set forth by the Superior Court. In its June 1, 2012 opinion, the Superior Court

stated that "[t]o prevail on a claim of ineffective assistance of counsel a petitioner must show, by a preponderance of the evidence, ineffective assistance of counsel which, in the circumstances of the particular case, so undermined the truth-determining process that no reliable adjudication of guilt or innocence could have taken place." (Doc. 10-19, p. 6) (citation omitted). "The petitioner must demonstrate: '(1) the underlying claim is of arguable merit; (2) … counsel had no reasonable strategic basis for his …action or inaction; and (3) but for the errors and omissions of counsel, there is a reasonable probability that the outcome of the proceedings would have been different.'." (Doc. 10-19, p. 6) (citation omitted). The identical standards are set forth in the Superior Court's January 15, 2016. (Doc. 10-24, p. 5).

The Third Circuit has specifically held that the very ineffective assistance of counsel test relied upon by the Superior Court in this matter is not contrary to the Supreme Court's *Strickland* standard, and Watson does not argue otherwise. *See Werts v. Vaughn*, 228 F.3d 178, 204 (3d Cir. 2000). Instead, he contends that the state courts' adjudication of the claims either resulted in a decision that involved an unreasonable application of clearly established Federal law or resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented.

1. <u>Ground II</u>

In his second ground, Watson asserts that trial counsel's representation of Commonwealth witness Rodney Watson was a conflict of interest and violated his Sixth Amendment right to effective assistance of counsel. (Doc. 1-1, p. 21). In his PCRA proceedings, Watson framed the issues as follows: "Did [Watson's] trial attorney have a conflict of interest which prejudiced [Watson] when he represented [Watson] while and after he also represented Rodney Watson thus causing the need for a new trial? (Ineffective assistance of counsel)." (Doc. 10-19, p. 4). The Superior Court set forth the following standard applicable to a claim of ineffective assistance of counsel based on a conflict of interest:

> When a claim of ineffective assistance of counsel is based on an alleged conflict of interest, prejudice will be presumed if counsel is shown to have had an actual conflict of interest. If an appellant can demonstrate the existence of an actual conflict of interest which adversely affected his counsel's performance, then he is entitled to a new trial. To make such a showing, an appellant must demonstrate that counsel actively represented conflicting interests and that an actual conflict of interest adversely affected his lawyer's performance. An actual conflict of interest is evidenced whenever during the course of representation, the interests of appellant – and the interests of another client toward who counsel bears obligations – diverge with respect to a material factual or legal issue or to a course of action.
>
> *Commonwealth v. Padden*, 783 A.2d 299, 309-10 (Pa. Super. 2001) (internal citations and quotation marks omitted) (emphasis in original [omitted]).

(Doc. 10-19, p. 9).  This standard comports with Supreme Court precedent which dictates that "[i]n order to establish a violation of the Sixth Amendment, a defendant who raised no objection at trial must demonstrate that an actual conflict of interest adversely affected his lawyer's performance.  *Cuyler v. Sullivan*, 446 U.S. 335, 348 (1980).

In reviewing Fannick's PRCA hearing testimony, the Court found as follows:  "(1) he represented Rodney Watson in an unrelated drug case; (2) when he became aware Rodney Watson was connected to [Watson's] homicide case, counsel informed Rodney Watson he was going to withdraw from the case, and counsel prepared a motion to withdraw; (3) another attorney subsequently entered his appearance on behalf of Rodney Watson as privately retained counsel; (4) counsel did not discuss anything related to [Watson's] homicide case with Rodney Watson at any point in time; (5) counsel did not take part in Rodney Watson's plea negotiations in the drug case; and (6) counsel cross-examined Rodney Watson at trial concerning the plea agreement he reached in his drug case (which counsel learned through discovery)."  (Doc. 10-19, p. 13).  Based on these facts, the court concluded that Watson's underlying claim lacked merit in that he failed to demonstrate that counsel actively represented conflicting interests, which adversely affected his representation of Watson's case.  (*Id.* citing *Padden, supra*).   The state

court also concluded that Watson failed to satisfy the prejudice prong of the ineffective assistance of counsel claim. The foregoing analysis represents a reasonable application of the *Strickland* ineffectiveness test.

Moreover, the state court's factual determinations were objectively reasonable in light of the evidence presented during the PCRA hearing. Fannick testified that his representation of Watson overlapped, to some degree, "for a brief period" with his representation of Rodney Watson in a drug case pending in the Court of Common Pleas of Lackawanna County. (Doc. 10-12, p. 14). He indicated that there came a point in that representation that he felt there was a potential for a conflict of interest. (*Id.*) Specifically, he testified that "I remember that I had difficulty finding Rod Watson to speak with him, I do remember that there was a point in time when Rod Watson apparently was negotiating his own plea agreement or – or was negotiating because he was going to testify against Mr. [James] Watson. When I caught wind of that, that's when, you know, I – I knew I couldn't speak with Rod Watson, or didn't felt [sic] appropriate that I speak with Rod Watson, the he should have another lawyer if he was attempting to negotiate or give information regarding someone that I had represented, that I was representing." (*Id.*) He further testified that when Rodney Watson was "finally apprehended and incarcerated, I went to talk to him and he indicated to me that he

wanted to talk to police about the homicide, and that's when I immediately said then you can't, I don't want to talk to you any further." (Doc. 10-14, p. 30). Fannick notified Rodney Watson of the potential conflict and prepared a motion to withdraw. (Doc. 10-12, pp. 12, 13; Doc. 10-14, pp. 30, 31). However, because the "Watson family" informed him that Rodney Watson would be retaining other counsel, and because new counsel entered his appearance in the case, thereby eliminating the conflict, he deemed it unnecessary to file the motion to withdraw. (Doc. 10-12, at 12, 13). He testified that he "was basically the lawyer for the Watson family so, I don't think there was any secret that I at one time or another had represented various Watson's [sic]." (Doc. 10-12, p.19).

Fannick represented that any discussion of the Jason Ryans homicide with Rodney Watson was limited to the above exchange. (Doc. 10-14, p. 31). He testified that he did not suggest to Rodney Watson that he should cooperate in the homicide, categorically denied any involvement in the Commonwealth's decision not to prosecute Rodney Watson for his involvement in the Jason Ryans homicide, had no role in the negotiation of Rodney Watson's plea agreement, and reaped no benefit, in his capacity as James Watson's attorney, specifically in the cross-examination of Rodney Watson, as a result of his prior representation of Rodney

Watson. (Doc. 10-12, pp. 15-17). He further indicated that he became aware of the terms of Rodney Watson's plea agreement through the discovery process. (*Id.*)

The state court's ruling represents a reasonable application of Supreme Court precedent. Its determination of the facts is also objectively reasonable in light of the evidence presented during the PCRA proceedings. Watson is not entitled to relief on this claim.

### 2. Ground IV

In the fourth ground, Watson argues that trial counsel was ineffective in failing to call as witnesses McKenzie Keller ("Keller") and Janelle Prato ("Prato"). He argued in state court, as he does here, that that "Jennifer Barr told Janelle Prato shortly after the homicide that Watson did not kill [Ryans]. [Watson] declares Ms. Prato met with counsel's investigator at Ms. Keller's house and told the investigator and Ms. Keller about what Ms. Barr had said. [Watson] submits counsel had no reasonable strategic basis for failing to call Ms. Prato and Ms. Keller as defense witnesses to rebut Ms. Barr's trial testimony." (Doc. 10-19, p. 19). We will consider each witness in turn.

In considering trial counsel's failure to call Keller, the Superior Court evaluated the proffered testimony and concluded that because Keller "did not personally witness or hear the Barr-Prato conversation and her proffered testimony

relates only to what Ms. Prato said had occurred," the testimony constituted inadmissible hearsay under Rule 801(c) of the Pennsylvania Rules of evidence. (Doc. 10-19, p. 22). Consequently, counsel could not be deemed ineffective. Alternatively, the state court noted that "[t]o the extent [Watson] would offer Ms. Keller's testimony only to corroborate Ms. Prato's testimony that the Barr-Prato conversation took place, but not for the truth of the matter asserted, such testimony is too attenuated to satisfy the prejudice prong of the ineffectiveness test." (Id. ap 23, n. 7). We find that this is an objectively reasonable application of *Strickland*. It is also a reasonable determination of the facts given the evidence of record. At the PCRA hearing, Keller and Prato testified that, at some point prior to Watson's trial, Keller, her mother, Prato and an individual identified as "Ms. Herbert" were sitting at her mother's kitchen table while Attorney Fannick's investigator interviewed them about the conversation Prato had with Barr. (Doc. 10-12, pp. 82-92). Keller testified that she was to be called as a witness for the defense and that she was "one hundred percent" sure that she was coming to testify to the credibility of Jennifer Barr. (*Id.* at 94).

The claim concerning Prato's testimony, initially considered waived by the PCRA court, was remanded by the Superior Court for consideration on the merits.

On remand, the PCRA court determined that counsel was not ineffective in failing to call Prato to testify. On appeal, the Superior Court thoroughly addressed the issue in conducting the following analysis:

> To establish counsel's ineffectiveness for failure to call a witness, a petitioner must demonstrate:

>> (1) The witness existed; (2) the witness was available; (3) counsel was informed of the existence of the witness or counsel should otherwise have known of [her]; (4) the witness was prepared to cooperate and testify for [Watson] at trial; and (5) the absence of the testimony prejudiced [Watson] so as to deny him a fair trial. A defendant must establish prejudice by demonstrating that he was denied a fair trial because of the absence of the testimony of the proposed witness. Further, ineffectiveness for failing to call a witness will not be found where a defendant fails to provide affidavits from the alleged witnesses indicating availability and willingness to cooperate with the defense.

> *Commonwealth v. O'Bidos*, 849 A.2d 243, 249 (Pa.Super. 2004) *appeal denied,* 580 Pa. 696, 860 A.2d 123 (2004) (citations omitted).

>> Instantly, the PCRA court reasoned as follows:

> [Watson] failed to prove that defense counsel knew or should have known about [the Prato-Barr conversation]. [Ms.] Prato herself testified that she provided her information to counsel's private investigator, but there is no evidence that the investigator relayed [Ms.] Prato's statements to counsel, and counsel denied having been told about the testimony [Ms.] Prato might have offered.

> The only evidence that defense counsel was informed prior to trial of [Ms.] Prato's testimony came from [Watson] himself, who claims he asked defense counsel about calling [Ms.] Prato to testify. [Watson's] testimony was not credible.

When first questioned by the police, [Watson] gave a detailed account of how he had been involved in the beating, kidnapping, and execution of [Ryans], an account that was wholly consistent with the facts related by [Rodney] Watson, who was present at all times, and by [Ms.] Barr, who was present for the kidnapping and murder[;] however, while testifying during the PCRA hearing, [Watson] radically changed his story. He now claims he was present when [Ryans] was beaten, but then went home and remained home while [Ryans] was kidnapped and killed.

Because [Watson's] PCRA hearing testimony is not reliable, the court finds that [Watson] has not established by a preponderance of the evidence that defense counsel knew or should have known that [Ms.] Prato could testify about [Ms.] Barr's prior inconsistent statement. Further, there is no evidence that defense counsel was derelict in his selection of a private investigator, nor in relying on the investigator to provide him with any and all exculpatory evidence.

The court also finds that [Watson] has failed to establish the fifth element of a claim of ineffective assistance for failure to call a witness: The absence of [Ms.] Prato's testimony was not so prejudicial to [Watson] as to have denied him a fair trial.

The evidence against [Watson] at trial included the testimony of [Watson's] mother that [Watson] has confessed to her that he had killed [Ryans] because he believed that after [Ryans] was beaten he represented a threat to Kenny Watson and his family. Rodney Watson testified that he personally witnessed [Watson] shoot [Ryans]. Numerous witnesses supplied testimony that [Watson] orchestrated the kidnapping and the killing, and commanded the after-the-fact cover-up. [Ms.] Barr's testimony was corroborated, often in fine detail, by Rodney Watson and, except for [Watson's] claim that Kenny Watson was the shooter, [Watson's] own statement to the police. The remarkable consistency of the statements of those involved leading to the moment of the execution imbues [Ms.] Barr's testimony with an authenticity that

her prior inconsistent statement lacks. Moreover, [Ms.] Prato's testimony about [Ms.] Barr's inconsistent statement refers to a time before [Watson's] arrest and before [Ms.] Barr changed her initial statement to the police that Kenny Watson was the shooter. At the trial, [Ms.] Barr acknowledged that she had previously exculpated [Watson], but explained that she did so because she was in fear of [Watson]. Thus, [Ms.] Prato's testimony was cumulative of an inconsistency that [Ms.] Barr readily acknowledged. The testimony of [Ms.] Prato would have carried little weight, if any.

(PCRA Court Opinion, filed January 2, 2015, at 3-4). The record supports the PCRA court's analysis. The court explicitly discredited [Watson's] PCRA hearing testimony. The court's observation that defense counsel denied any awareness of the Prato-Barr conversation, when read in the context of the court's conclusion that no evidence showed the Prato-Barr conversation was relayed to defense counsel, makes clear the court credited counsel's testimony. Thus, [Watson] failed to satisfy his burden to show defense knew or should have known of Ms. Prato and her potential testimony. *See Knighten, supra; O'Bidos, supra.* Further, [Watson] failed to satisfy the prejudice prong, particularly where Ms. Barr's alleged statement to Ms. Prato was cumulative of her prior inconsistent statement to the police, which was introduced at trial, and Ms. Barr testified as to why she had initially attempted to exculpate [Watson]. *See id.* Therefore, defense counsel was not ineffective for failing to call Ms. Prato as a witness.

(Doc. 10-24, pp. 6-8). The Superior Court's decision involved a reasonable application of clearly established federal law. Further, it constituted an objectively reasonable determination of the facts in light of the evidence presented. This claim is without merit.

3.     <u>Ground V</u>

In his final ground, Watson argues that trial counsel was ineffective in failing to object when, during his closing argument, the prosecutor improperly referenced his Fifth Amendment right to remain silent. Specifically, Watson challenges trial counsel's failure to object to the following remark:

> I'm sorry I can't give you a transcript of the conversation in the kitchen, but who are the participants in that conversation? [Watson], Kenny Watson, Mickey Robinson. Mickey Robinson is in Guyana. He's not talking to anybody. [Watson] has got a right to remain silent based on the United States Constitution. Kenny Watson, he's got a constitutional right to remain silent founded on the [C]onstitution. I'm sorry I can't give you a transcript of that conversation. I'm sorry we didn't have a videotape set up in the kitchen…so you could hear what was discussed.

(Doc. 1-1, pp. 69, 76-78; Doc. 10-19, p. 10, citing N.T. [Trial, 9/11/02, at 83-84]). The state courts concluded that counsel could not be deemed ineffective because the underlying claim, that the prosecutor's remark violated Watson's Fifth Amendment right against self-incrimination, lacked merit. (Doc. 10-19, pp. 8-12, 14).

The Fifth Amendment, made applicable to the states by the Fourteenth Amendment, provides in relevant part that "[n]o person shall ... be compelled in any criminal case to be a witness against himself." U.S. CONST. amend V. The Fifth Amendment prohibits a prosecutor from suggesting to the jury that " 'it may treat the defendant's silence as substantive evidence of guilt.' " *United States v.*

34

*Robinson*, 485 U.S. 25, 32m(1988) (quoting *Baxter v. Palmigiano*, 425 U.S. 308, 319 (1976)); *see also Griffin v. California*, 380 U.S. 609, 614 (1965).  Although the Fifth Amendment "forbids either comment by the prosecution on the accused's silence or instructions by the court that such silence is evidence of guilt," *Griffin*, 380 U.S. at 615 (1965), "[[t]he] central purpose of a criminal trial is to decide the factual question of the defendant's guilt or innocence[.] *United States v. Nobles*, 422 U.S. 225, 95 S.Ct. 2160, 45 L.Ed.2d 141 (1975)...." *Delaware v. Van Arsdall*, 475 U.S. 673, 681 (1986).  "[B]oth the defendant and the prosecutor have the opportunity to meet fairly the evidence and arguments of one another. The broad dicta in *Griffin* to the effect that the Fifth Amendment "forbids ... comment by the prosecution on the accused's silence," 380 U.S., at 615, 85 S.Ct., at 1233, must be taken in the light of the facts of that case. It is one thing to hold…that the prosecutor may not treat a defendant's exercise of his right to remain silent at trial as substantive evidence of guilt; it is quite another to urge…that the same reasoning would prohibit the prosecutor from fairly responding to an argument of the defendant by adverting to that silence." *Robinson*, 485 U.S. at 33.  In opining that "[t]here may be some 'cost' to the defendant in having remained silent in each situation," the Supreme Court declined to expand *Griffin* to preclude a fair

response by the prosecutor to comments or arguments made by defense counsel. *Id.*

In considering Watson's claim, the Superior Court recognized that "[a] s a general rule, any comment that the prosecuting attorney makes regarding a defendant's election not to testify is a violation of the defendant's right against self-incrimination as guaranteed by the Fifth Amendment of the United States Constitution, Article 1, Section 9 of the Pennsylvania Constitution and by statute, codified at 42 Pa.C.S.A. § 5941. A comment is constitutionally and statutorily forbidden if the language used by the prosecutor is intended to create for the jury an adverse interest to testify. This rule is not an absolute bar to any reference to a defendant's failure to testify. A remark by a prosecutor, otherwise improper, may be appropriate if it is in fair response to the argument and comment of defense counsel." (*Id.* at 8) (citations omitted). The court ultimately concluded that the prosecutor's remark did not treat Watson's exercise of his right to remain silent at trial as substantive evidence of guilt. In predominantly relying on the PCRA court's analysis, the Superior Court stated as follows:

> The actual import of the District Attorney's argument was to concede that the Commonwealth could not present direct evidence of a conspiracy, but that circumstantial evidence proved the conspiracy nonetheless. Immediately before the statement which [Watson] claims is objectionable, the District Attorney made this statement:

> [Watson] and Kenny [Watson] are both running away from one
> common enemy, and that is there was an agreement, there was a
> conspiracy. They're both trying to deny that. But if you
> remember when we read [Watson's] statement into the record,
> [Watson] said…the other individual was afraid to leave [Ryans].
> Then [Watson] comes over and there's a discussion in the kitchen.
> ([N.T. Trial at 83]) [ ]

After calling the jury's attention to evidence (1) that [Watson's] own
statement to the police acknowledged that another member of the group
wanted to kill [Ryans], (2) that [Watson], who had left the house where
[Ryans] was held after being beaten, called back to the house stating
that he intended to shoot [Ryans], and (3) that [Watson] returned to the
house where a discussion was held in the kitchen, the District Attorney
then made the statement which [Watson] claims is objectionable.
Conveniently, [Watson] leaves out what preceded those words as well
as this statement which followed immediately thereafter:

> But if you look at the facts and circumstances of this case, you
> look at the type of individuals we're dealing with, … the type of
> conduct which they believed [Ryans] was responsible for, you
> know what that conversation was.

The District Attorney then explained that it was implausible that those
involved in the meeting were discussing taking [Ryans] to the hospital,
because they did not go to Mercy Hospital, which was 2,500 feet away,
the did not go to nearby Nesbitt Hospital, and they drove directly past
Tyler Memorial Hospital.

Thus, viewed in context, the statements which [Watson] finds
objectionable do no more than tell jurors that there is a gap in the direct
evidence as to what occurred when [Watson] returned to the house, but
that the facts and circumstances leave no doubt that the discussion in
the kitchen hatched the conspiracy that led to the murder of [Ryans].

(Doc. 10-19, p. 11).

In addition, it is clear from the record that, as permitted by *Robinson*, 485 U.S. at 33, the comment was a fair response to the closing arguments made by defense counsel. Both attorneys vehemently argued that the Commonwealth's case was wholly circumstantial, that every witness called by the Commonwealth had consistently lied during the investigation and trial, and that there simply was no plan or agreement. (Doc. 10-2, pp. 3-68). In fact, the main theme of Kenny Watson's attorney's closing argument was that there was no plan or agreement between Watson, Kenny Watson, and Michael Robinson ("Robinson") to kill Ryans. (Doc. 10-2, pp. 2: 13-25). Defense counsel argued that Commonwealth witness Jennifer Barr ("Barr" or "Jennifer") was adamant in her testimony that Kenny Watson did not want Ryans to die. "[Barr] knew that from her heart because she knew when she came back to the apartment after she took cleaning materials over to Tiffany and James told her that Kenny wanted to take him to the hospital, that's when the plan -- I'm not even going to call it a plan. That's when the goal between Mikey [Robinson], Jennifer and James [Watson] took place. And the goal was, we're not taking Jason to the hospital. If there was an agreement between Kenny and James to kill Jason, there would be no need for Jennifer." (*Id.* at 3). He argues "[i]t was a goal of James and Mikey and Jennifer, not a plan, to kill James [sic] – to kill Jason [Ryans]." (*Id.* at 4). Other references to the lack of

an agreement or plan include: "Jennifer knows and James knows, because they wouldn't have had to do what they did if Kenny would have agreed to kill him." (*Id.* at 11); "You don't take five people along with you to kill somebody. There was no plan. There was no agreement here. There [sic] no plan and there was no agreement." (Id. at 25); "That's a plan? No. It was James's goal not to take Jason [Ryans] to the hospital. It wasn't a plan, it was a goal…." (*Id.* at 26); "That's a plan?" (*Id.*); "Is that a plan?" (*Id.* at 26, 27); "The strategy was – there was no plan. The strategy was silence. When you don't have a plan, the next best thing you have to do then is go to silence." (*Id.* at 27). Even more significant is his argument, specifically made in anticipation of the district attorney's closing, that "[o]h,[the district attorney is] going to say, well, they drove past hospitals. That's a sign of an agreement right there. He's going to say, oh, he was right there, standing there. That's a sign of an agreement. That's not a sign of an agreement. If I'm walking down the street with somebody and they say they're going to go over here and rob the CVS or this Rite Aid drugstore, and I'm walking with them and they go in and rob the drugstore and come back with me, I had nothing to do with that. That's not an agreement." (*Id.* at 30).

Based on the above, we conclude that the state court reasonably applied governing Supreme Court precedent in determining that "[t]rial counsel cannot be

said to be ineffective for failure to pursue a meritless claim.  Watson's claim that

defense counsel was ineffective for failing to object to the District Attorney's

closing argument is meritless."  (Doc. 10-19, p. 12).  We also conclude that the

decision involved an reasonable determination of the facts in light of the evidence

of record. Habeas relief is not warranted.

## IV.    CERTIFICATE OF APPEALABILITY

Pursuant to 28 U.S.C. § 2253(c), unless a circuit justice or judge issues a

certificate of appealability ("COA"), an appeal may not be taken from a final order

in a proceeding under 28 U.S.C. § 2254.  A COA may issue only if the applicant

has made a substantial showing of the denial of a constitutional right.  28 U.S.C. §

2253(c)(2).  "A petitioner satisfies this standard by demonstrating that jurists of

reason could disagree with the district court's resolution of his constitutional

claims or that jurists could conclude the issues presented are adequate to deserve

encouragement to proceed further."  *Miller-El v. Cockrell*, 537 U.S. 322 (2003).

Petitioner fails to demonstrate that a COA should issue.

The denial of a certificate of appealability does not prevent Watson from

appealing the order denying his petition so long as he seeks, and obtains, a

certificate of appealability from the Third Circuit Court of Appeals.  *See* FED. R.

APP. P. 22(b)(1).

## V.    <u>**CONCLUSION**</u>

For the reasons set forth above, the petition for writ of habeas corpus

pursuant to 28 U.S.C. § 2254 will be denied.

A separate Order will enter